AO 91 (Rev. 08/09) Criminal Complaint          AUSA Jessica Kim

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| United States of America | ) |
| --- | --- |
| v. | ) |
|  | ) Case No. 2:17-mj-274 |
| WILLIAM P. ELSCHLAGER | ) |
|  | ) |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __August 2015 - January 2016__ in the county of __Washington__ in the __Southern__ District of __Ohio__, the defendant(s) violated:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. 2261A(2) | Cyberstalking |
| 18 U.S.C. 242 | Deprivation of Rights Under Color of Law |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

_____
Complainant's signature

Steven W. Pettyjohn, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __May 17, 2017__

_____
Judge's signature

Terence P. Kemp, United States Magistrate Judge
*Printed name and title*

City and state: __Columbus, Ohio__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN THE MATTER OF THE
CRIMINAL COMPLAINT OF:

MISC. NO. 2:17-mj-274

WILLIAM P. ELSCHLAGER

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Steven W. Pettyjohn, Special Agent, Federal Bureau of Investigation, being duly sworn, depose and say that:

### Introduction and Purpose

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) assigned to the Cambridge, Ohio Resident Agency. I am charged with the investigation of violations of federal statutes in the Southern District of Ohio. I have worked with the FBI since 2009. I have received specialized law enforcement training from the FBI. My duties as a Special Agent include conducting investigations of individuals and businesses that have violated federal law. I have participated in multiple such investigations.

2. I make this affidavit in support of a criminal complaint to arrest William Perry ELSCHLAGER, aka Bill Elschlager ("ELSCLHAGER"), for violations of 18 U.S.C. § 2261A(2) – cyberstalking, and 18 U.S.C. § 242 – deprivation of rights under color of law. Since this affidavit is being submitted for the limited purpose of securing a criminal complaint and arrest warrant, your affiant did not include each and every fact known concerning this investigation. Your affiant did not withhold any information or evidence that would negate probable cause. Your affiant set forth only the facts that are believed to be necessary to establish probable cause that ELSCHLAGER committed the violations listed above.

3. Based upon my experience and the facts presented in this Affidavit, I contend there is probable cause to believe that ELSCHLAGER, with the intent to harass or intimidate, or place under surveillance with intent to harass or intimidate, unlawfully cyberstalked victim A.D.B., aka A.D.P., by using an interactive computer service and/or a facility of interstate or foreign commerce, which caused, attempted to cause, or would be reasonably expected to cause substantial emotional distress to A.D.B., in violation of 18 U.S.C. § 2261A(2). I further contend there is probable cause to believe that ELSCHLAGER, while acting under color of law, deprived A.D.B. of her right to be free from unreasonable searches and seizures, a right secured by the Constitution and laws of the United States, in violation of 18 U.S.C. § 242.

1

## Facts Supporting Finding of Probable Cause

4. ELSCHLAGER was a Lieutenant with the Ohio State Highway Patrol (OSP) in Marietta, Ohio. ELSCHLAGER was the post commander for the Marietta Post of OSP. ELSCHLAGER had been employed with OSP for approximately nineteen years. During his law enforcement career, ELSCHLAGER received extensive training on the policies and procedures of the OSP. At the time of his commission, ELSCHLAGER took an oath to uphold the United States Constitution, as well as the constitution and laws of the State of Ohio. As a Lieutenant with the OSP, ELSCHLAGER was authorized by the laws of the State of Ohio to conduct traffic stops and searches and seizures.

5. A.D.B. was married to an OSP Trooper, M.B., when she first met ELSCHLAGER. At that time, ELSCHLAGER was a Sergeant with OSP at the Marietta Post. In or around December 2014, ELSCHLAGER befriended A.D.B. through text messages and Facebook messages. In or around April 2015, ELSCHLAGER and A.D.B.'s friendship became physical. They had an affair from in or around April 2015 through in or around August or September 2015.

6. Toward the end of the affair, A.D.B. described ELSCHLAGER as being creepy. A.D.B. described a few instances at the end of the affair which unnerved her. The incidents are as follows:

    6.1. The first incident was a ball of hair she found in a drawer in ELSCHLAGER's bathroom. A.D.B. was at ELSCHLAGER's house and went to use the bathroom. She saw a drawer was open and that there was a large ball of hair. A.D.B. asked ELSCHLAGER about the ball of hair. ELSCHLAGER told her the ball of hair was made up of hair he had found in his house. A.D.B. believed the hair was hers.

    6.2. The second incident occurred when A.D.B. was using ELSCHLAGER's iPad while at his house. A.D.B. found numerous photographs of herself in a file labeled "A.D.B." on the iPad. The pictures included photos from her marriage to M.B., pictures of A.D.B. playing with her son, and pictures where M.B. had been cut out. A.D.B. believes the pictures were all taken from the internet, including her Facebook account. A.D.B. noticed there were other folders with other women. A.D.B. felt ELSCHLAGER was "creeping" on Facebook and Instagram.

    6.3. A.D.B. would occasionally take a nap at ELSCHLAGER's residence during their affair. During one of her naps, A.D.B. awoke to ELSCHLAGER taking photographs of her sleeping. A.D.B. later found other photographs ELSCHLAGER had taken of her during her naps. A.D.B. was unaware ELSCHLAGER was home when she took her naps. She did not know he was taking photographs of her napping. A.D.B. told ELSCHLAGER she did not want to see him anymore.

7. After ending the affair, in or around October 2015, A.D.B. started to see ELSCHLAGER everywhere she went. A.D.B. saw ELSCHLAGER in his OSP vehicle and uniform. She would also see ELSCHLAGER in his personal vehicle and not in uniform. A.D.B. felt she was being followed by ELSCHLAGER. As the events listed below progressed, A.D.B. stated

she felt she was being "insanely stalked" by ELSCHLAGER. A.D.B. referenced instances of stalking as follows:

7.1. After ending the affair with ELSCHLAGER, A.D.B. started a new relationship with G.R. While staying at G.R.'s house in Noble County, Ohio, A.D.B. noticed a Cadillac sitting at the end of G.R.'s driveway. It was odd for an unknown vehicle to be at the end of the driveway, as G.R. lived on a farm in an isolated area of Noble County. The Cadillac stayed at the end of the driveway for a while and eventually left.

7.2. A few weeks later, A.D.B. was driving on Interstate 77 between Washington County and Noble County, Ohio. There was a lot of traffic as a lane was closing down the road. A.D.B. noticed a car come up and stay in her blind spot just off the driver's side door. A.D.B. noticed the vehicle was the same Cadillac she had noticed at G.R.'s residence. A.D.B. eventually noticed the driver of the Cadillac was ELSCHLAGER. A.D.B. later found out the vehicle belonged to ELSCHLAGER's uncle. A.D.B. was concerned ELSCHLAGER was following her and did not want to stop. G.R. was in the vehicle with her. ELSCHLAGER followed A.D.B. and G.R. around.

7.3. In or around late November/December 2015, A.D.B. was driving on Ohio Highway 564 with G.R. A.D.B. saw a blue Chevy or GMC truck with orange lights on top driving the opposite direction they were travelling. A few moments later, the truck had spun around and was riding A.D.B.'s bumper. A.D.B. saw the driver of the truck was ELSCHLAGER. ELSCHLAGER's truck had a smashed driver's side door with yellow paint down the side. ELSCHLAGER then sped up beside A.D.B. and started to yell at her. A.D.B. did not acknowledge him and kept driving. A.D.B. was concerned. ELSCHLAGER followed A.D.B. and G.R. from Noble County, Ohio to Newport, Ohio. A.D.B. continued to drive around with G.R. She eventually got a text message from ELSCHLAGER that said she could go home and that he was not going hurt her or G.R.

  7.3.1. A check of the Ohio Bureau of Motor Vehicles data system reveals that ELSCHLAGER has a blue 2001 Chevrolet Silverado 2500HD truck registered to his name.

7.4. ELSCHLAGER called A.D.B. three times and told her complaints had come in about her speeding. A.D.B. later found out that only one of the complaints was legitimate.

7.5. A.D.B. had to drive past the OSP Marietta Post to get to work from Newport, Ohio. Every time she passed the post, she would go as fast as she could to avoid seeing ELSCHLAGER. After she would pass the post, she would get a text from ELSCHLAGER.

7.6. In or around November 2015, ELSCHLAGER gave A.D.B. a pair of tickets to a concert in Huntington, WV. A.D.B. and a friend went to the concert and came back that night. ELSCHLAGER called A.D.B. and told her he knew she did not stay in Huntington the night of the concert. ELSCHLAGER said he had skills and ways to check up on her. He referenced resources to tell where someone was by sources and plate-reading capabilities.

3

7.7. On or about December 2, 2015, A.D.B. went to Toy-R-Us in Vienna, WV. She then went to Wal-Mart. While in Wal-Mart, she received a text message from ELSCHLAGER. The text message said she needed to be aware of her surroundings and watch who she was around.

    7.7.1. A review of Brickhouse Security records for a Spark Nano 4.0 GPS Tracker, described in more detail below, revealed that a GPS tracker started recording data on or about December 2, 2015 in Tygart, West Virginia.

7.8. In or around December 2015, ELSCHLAGER showed up at A.D.B.'s residence unannounced. A.D.B. had stayed home with her sick child and G.R. The three went into her back yard to let her child play. A.D.B. saw ELSCHLAGER standing in the yard of a vacant duplex staring the three of them. All three of them went back into the residence when she saw ELSCHLAGER. As she entered the residence, she looked back and saw ELSCHLAGER give her an obscene gesture with his hand.

7.9. In or around December 2015, A.D.B. had let her dog outside in the evening. A.D.B. heard her dog run down the side of the house to the front of the residence. A.D.B. went out the front door to look for her dog. When she got on the front porch, she saw a dark figure dressed in all dark clothes. ELSCHLAGER said, "It's me." A.D.B. noticed ELSCHLAGER was dressed in a dark sweater, dark pants, and mud boots. A.D.B. became concerned and stayed on the porch. ELSCHLAGER said he needed to talk to her. A.D.B. told her she could not talk to him. ELSCHLAGER then told her he had put A.D.B. and her child on his insurance policy. A.D.B. told him she did not want him to do that and asked how he got her information. ELSCHLAGER told her he had accessed her husband's, M.B., personnel file to get A.D.B. and her child's identifying information.

8. A.D.B. was concerned for her safety. A.D.B. was concerned that she was being followed and stalked. A.D.B. pointed out a few factors for her fear. They are as follows:

    8.1. A.D.B. was concerned because she felt she had no one to help her. ELSCHLAGER was a law enforcement officer and had told A.D.B. he had friends at the Washington County Sheriff's Office and Marietta Police Department in Ohio. A.D.B. felt she had no law enforcement agency to help her.

    8.2. A.D.B. was also in fear because ELSCHLAGER always had a gun on his person. On at least one occasion, she noted that ELSCHLAGER carried a gun on his belt and another gun on his ankle. ELSCHLAGER had told A.D.B. at one time, "I always have a gun on me. You've just never known it."

9. On or about December 14, 2015, ELSCHLAGER unlawfully conducted a traffic stop of A.D.B. ELSCHLAGER was in his OSP vehicle and uniform to include wearing his duty weapon. ELSCHLAGER approached A.D.B.'s passenger side of his vehicle. A.D.B. noticed ELSCHLAGER turn off the audio recording on his duty belt. ELSCHLAGER then stuck his head inside A.D.B.'s vehicle. ELSCHLAGER told A.D.B. he pulled her over because another

trooper was going to pull her over for speeding. ELSCHLAGER did not ask for any documents from A.D.B., including license, registration, or proof of insurance. The traffic stop was not documented as required by OSP policy.

- 9.1. A.D.B. believes the traffic stop lasted for approximately ten minutes, but it felt longer to A.D.B. A.D.B. said she did not feel comfortable. ELSCHLAGER only spoke about personal issues he had about their relationship. A.D.B. felt more and more uncomfortable as time went on. A.D.B. felt she could not leave and realized how bad her life was going to be moving forward. A.D.B. was eventually allowed to leave. She drove to work and had what she described as a mental meltdown.

10. On or about December 29, 2015, A.D.B.'s vehicle broke down at a gas station at the lower Salem exit off of Interstate 77. A.D.B. mentioned the following events when her car broke down:

    - 10.1. A.D.B. posted to Facebook that her vehicle had broken down, but did not put the location. ELSCHLAGER immediately started to text, message, and call A.D.B. after she posted the message. A.D.B. did not answer any of ELSCHLAGER's calls. A.D.B. called her uncle and a tow company to help her. She was picked up and then returned at a later time to meet the tow truck.

    - 10.2. A.D.B. finally took a call from ELSCHLAGER as she was returning to her vehicle. ELSCHLAGER asked why she did not call him. A.D.B. told him she did not want his help. When she went back to the vehicle, ELSCHLAGER was already at her vehicle. A.D.B. could not figure out how he knew where her vehicle was. No one had told him and she had not posted anything to Facebook about the vehicle location. A.D.B. already felt ELSCHLAGER was following her.

    - 10.3. ELSCHLAGER was in his OSP vehicle and OSP uniform when A.D.B. arrived at the gas station. ELSCHLAGER and A.D.B. had a verbal argument at the gas station. A.D.B. did not want ELSCHLAGER to look at her car. A.D.B. eventually allowed ELSCHLAGER to look at her car because she was tired of arguing and ELSCHLAGER would not leave.

    - 10.4. The tow truck driver arrived and told A.D.B. her radiator cap was missing. The tow truck driver did not take her car and recommended she get a radiator cap and coolant. A.D.B. did not want ELSCHLAGER to help but he did not listen to her. ELSCHLAGER left and came back in civilian clothes and his personal car with the radiator cap and coolant.

    - 10.5. ELSCHLAGER fixed the vehicle and then told A.D.B. to take a test drive with him. A.D.B. felt she did not have a choice and felt concerned for her safety. A.D.B. knew ELSCHLAGER always carried a gun on him regardless of if he was on duty or not. A.D.B. was concerned he would harm her if she did not go on the test drive.

5

10.6. Search warrants were later obtained by Washington County Sheriff's Office investigators for ELSCHLAGER's residence and electronic devices, described in more detail below. A search of ELSCHLAGER's electronic devices showed internet searches on topics such as: "how long can a car go without a radiator cap," "car overheating with radiator cap off," "did driving without radiator cap damage engine?" and "missing radiator cap?" The searches were conducted on or about December 26, 2015, before A.D.B.'s vehicle broke down on or about December 29, 2015.

11. On or about January 8, 2016 and January 9, 2016, A.D.B.'s vehicle was broken into on two occasions. A.D.B. was staying at G.R.'s house.

    11.1. On or about the night of January 8, 2016, A.D.B. had left her car unlocked at G.R.'s house, as it was a farm that was isolated in the country. The next morning, A.D.B. noticed items from her car were missing. A bag containing her grandmother's ring and a necklace, clothing, toiletries, and her divorce papers were all missing. The spare key to her car was also in the bag.

    11.2. During the day of January 9, 2016, A.D.B. bought items to replace the things that were taken the night before. She spent the night at G.R.'s house again. This time, she locked the car and an alarm was set. That night it rained really hard. Around 4:00 AM, A.D.B. heard her car alarm go off. She and G.R. ran outside and noticed that everything she had bought the day prior had now been taken. A.D.B. thought ELSCHLAGER had taken the items both days.

    11.3. A.D.B. called ELSCHLAGER and confronted him about the break-ins. ELSCHLAGER told her a story of a friend of his that broke into her car the first night. ELSCHLAGER gave her permission to search his house and truck. A.D.B. and a friend searched ELSCHLAGER's truck and house. She found items which had been taken from her car the first night. She did not find the ring.

    11.4. A.D.B. went to confront ELSCHLAGER about what she found. ELSCHLAGER was at work at the OSP Marietta Post. A.D.B. confronted him about the items. According to A.D.B., ELSCHLAGER denied what happened and smirked at A.D.B. the whole time.

12. On or about January 17, 2016, Washington County Sheriff's Office conducted a search of ELSCHLAGER's residence and electronic devices. As part of that search, the following items were found:

    12.1. An interview was conducted by the Washington County Sheriff's Office of ELSCHLAGER. ELSCHLAGER was advised that his cell phone was part of the search warrant. After being advised that he would have to turn over his cell phone, ELSCHLAGER admitted there would be GPS tracking software found on his cell phone. ELSCHLAGER further admitted there would be evidence of the GPS tracking device on both his cell phone and home computer. During the search warrant of his residence, Washington County Sheriff's Office personnel found ELSCHLAGER's

6

home computer. The computer was on and the screen had a program opened up which showed real-time location of a GPS tracker.

12.2. Washington County Sheriff's Office personnel contacted A.D.B. to determine her location. Washington County Sheriff's Office asked A.D.B if she was in West Virginia. A.D.B. confirmed she was in West Virginia. A.D.B. was asked to come to Washington County, Ohio. Washington County Sheriff's Office personnel watched ELSHCLAGER's computer and the GPS tracking program, on which they saw A.D.B. leave and the path she travelled to Washington County, Ohio.

12.3. A.D.B. arrived in Washington County, Ohio on or about January 17, 2016. When she arrived, she met with Washington County Sheriff's Office personnel. Washington County Sheriff's Office personnel searched A.D.B's vehicle and found the GPS tracker.

12.4. Records from Brickhouse Security were received by the Washington County Sheriff's Office. The records show that a Spark Nano 4.0 GPS Tracker and a Magnetic Waterproof Case for Spark Nano were purchased by ELSCHLAGER on or about November 23, 2015. Records also show that a second Spark Nano 4.0 GPS Tracker was purchased by ELSCHLAGER on or about December 26, 2015. On both occasions, the items were sent to ELSCHLAGER's residence. The GPS records indicate that a GPS tracker was on A.D.B's vehicle on or about December 2, 2015 through and including January 17, 2016.

12.5. Six videos were found on ELSCHLAGER's cell phone. The videos were later verified by A.D.B. that they were taken outside of G.R.'s residence. A.D.B. and G.R. were unaware that they were being recorded. They did not know anyone was on G.R.'s property.

  12.5.1. Three videos time-stamped December 26, 2015 at 8:38PM, 8:47PM, and 8:55PM contained images appeared to have been taken while outside of G.R.'s residence.

  12.5.2. Two videos time-stamped January 8, 2016 at 7:01PM and 8:45PM contained images of peering through a window to view A.D.B. and G.R. sitting on the couch or at the kitchen table.

  12.5.3. Another video time-stamped January 9, 2016 at 10:08PM contained images of peering through a window into the living room of G.R.'s residence.

12.6. A search of ELSCHLAGER's electronic devices revealed additional internet searches conducted in or around December 2015 and January 2016 on topics such as: "obsessing over your ex sleeping with someone else," "how to cope when your spouse is unfaithful," "what to do with an unfaithful wife," "how to make your ex miss you," "how to get your ex back – even when they are dating someone," "how to hack a Facebook account," and "software to hack facebook."

7

12.7. A search of ELSCHLAGER's personal computer revealed at least ten photographs of personal identifying information; specifically, photographs of the screen of his patrol-car computer revealing "LEADS" information, which is generated when a driver's license or vehicle license plate number is entered into a state repository of driver information. "LEADS" information includes personal identifying information such as an individual's name, driver's license number, vehicle license plate number, date of birth, address, photo, etc. All of the photographs containing LEADS information found on ELSCHLAGER's computer were of females. Interviews were conducted of the women, which confirmed that they were stopped by OSP on or around the dates on the photographs. None of the women could verify the name of the trooper who stopped them.

13. A.D.B. continues to battle with emotional distress from the incidents involving ELSCHLAGER. She is paranoid that ELSCHLAGER is watching her. She cannot sit in front of a window at her own residence for fear he is watching her. When A.D.B. sees a blue truck like ELSCHLAGER's, she starts to have a panic attack and then starts to cry. A.D.B. slept with her son every night during the stalking. She feared something would happen to her son. A.D.B. thinks ELSCHLAGER blames her for losing his job and will harm her for it.

## Conclusion

14. The evidence above indicates that there is probable cause to believe that ELSCHLAGER, with the intent to harass or intimidate, or place under surveillance with intent to harass or intimidate, unlawfully cyberstalked victim A.D.B., aka A.D.P., by using an interactive computer service and/or a facility of interstate or foreign commerce, which caused, attempted to cause, or would be reasonably expected to cause substantial emotional distress to A.D.B., in violation of 18 U.S.C. § 2261A(2). The evidence further indicates that there is probable cause to believe that ELSCHLAGER, while acting under color of law, deprived A.D.B. of her right to be free from unreasonable searches and seizures, a right secured by the Constitution and laws of the United States, in violation of 18 U.S.C. § 242.

FURTHER AFFIANT SAYETH NAUGHT.

_____
STEVEN W. PETTYJOHN
Special Agent, FBI

Subscribed and sworn to before me,
this __17TH__ day of May 2017.

_____
THE HONORABLE TERENCE P. KEMP
UNITED STATES MAGISTRATE JUDGE